IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| LEANDREW LEWIS, | : | Case No. 1:09-CV-079 |
| | : | |
| Plaintiff, | : | Chief Judge Susan J. Dlott |
| | : | |
| v. | : | ORDER GRANTING |
| | : | DEFENDANT'S MOTION FOR |
| CSX TRANSPORTATION, INC., | : | SUMMARY JUDGMENT, |
| | : | DENYING DEFENDANT'S |
| Defendant. | : | MOTION TO STRIKE |
| | : | DEPOSITIONS, AND DENYING |
| | : | AS MOOT DEFENDANT'S |
| | : | MOTION TO STRIKE |
| | : | CAUSATION OPINIONS |

This matter comes before the Court on Defendant CSX Transportation, Inc.'s Motion for

Summary Judgment (Doc. 42), Motion to Strike Certain Submission Filed In Opposition to

CSX's Motion for Summary Judgment and/or Motion for Sanctions (hereinafter "Motion to

Strike Depositions") (Doc. 58), and Motion to Strike Andrew Markiewitz, M.D.'s Causation

Opinions (Doc. 41).

Plaintiff Leandrew Lewis originally filed this case on November 9, 2005 in the United

States District Court for the Eastern District of Pennsylvania. Lewis alleges that throughout the

course of his employment with CSX, he suffered injuries to his wrists that eventually led to

carpal tunnel syndrome and that those injuries were caused by Defendant's negligence. He sues

Defendant CSX under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51, *et seq*.

In January 2009, after Defendant filed an Answer, the case was transferred to this Court.

Thereafter, the parties engaged in discovery and Defendant CSX filed a Motion for Summary

Judgment and several related motions.

For the reasons that follow, the Court **GRANTS** Defendant's Motion for Summary Judgment, **DENIES** Defendant's Motion to Strike Depositions, and **DENIES** as **MOOT** Defendant's Motion to Strike Andrew Markiewitz, M.D.'s Causation Opinions.

## I.      MOTIONS TO STRIKE

CSX moves to strike certain evidence upon which Lewis relies in opposing CSX's motion for summary judgment.  First, CSX moves to strike the depositions of three current and former CSX employees – Heath Weldon, the current Director of General Claims, Dr. Thomas Cook, the former Chief Medical Officer, and Theodore Robert Snider, the former Director of safety. (Doc. 58.)  Although Lewis treats Weldon, Dr. Cook, and Snider as key witnesses, his counsel did not actually depose any of them in this case.[1]  Rather, their depositions were taken in 2009 and 2010 in the context of other cases involving various claims against CSX.  CSX argues that the Court should not consider those depositions because Lewis never informed CSX that he planned to call Weldon, Dr. Cook, and Snider as witnesses or use their depositions in this case. This Court is uneasy with the idea of Lewis hanging his hat on the depositions of three individuals that were taken in the context of different cases.  In some cases, where a witness's testimony is specifically related to the given set of facts at issue in a particular case, there is a risk that the testimony may be misinterpreted if applied out of context in another case.  To alleviate that risk, Lewis should have at least notified CSX during the discovery period of his intent to use those depositions.  Such notice would have provided CSX an opportunity to depose

---

[1] Defense counsel in this case also were not present at the depositions although another member of defense counsel's firm, Burns, White, & Hickton, LLC, was present at the depositions of Dr. Cook and Snider.

those individuals with a focus on the particular facts of this case.  In the absence of any such notice, Lewis's production of the depositions in response to CSX's motion for summary judgment too closely walks the line of ambush litigation.[2]

On the other hand, CSX should have been aware of the existence of the depositions of Dr. Cook, Snider, and Weldon because all three depositions were taken in the context of litigation against CSX.  Additionally, the testimony of Dr. Cook, Snider, and Weldon mainly pertains to CSX's general policies for dealing with safety, medical, and legal issues related to occupational injuries.  In fact, the testimony is so general that the Court's ultimate ruling on Defendant's Motion for Summary Judgment would be the same whether or not the Court considers the depositions.  Accordingly, although the Court does not condone Lewis's litigation tactics, the Court denies Defendant's Motion to Strike Depositions.  (Doc. 58.)

CSX's second motion to strike pertains to the causation opinions of Dr. Markiewitz, which appear in a five-page report that Lewis attached to his response to CSX's Motion for Summary Judgment.  (Doc. 41.)  Dr. Markiewitz's opinion on causation is contained within two short paragraphs of the report,[3] wherein he states that "[i]n light of the absence of trauma and contributing medical comorbidities, I believe that his carpal tunnel was due to work related issues in that his early presentation represents more than a 50% contribution."  (Markiewitz

---

[2] In his Response to Defendant's Motion for Summary Judgment, Plaintiff complains that Weldon did not bring with him to his deposition all of the documents requested by the parties deposing him.  Plaintiff's complaint highlights one of the problems with relying on a deposition taken in a different case.  Had Plaintiff attempted to depose that individual in this case, Plaintiff could have requested the Court's intervention if he felt that the witness did not fully comply with his subpoena.  However, it is disingenuous for Lewis to raise discovery concerns at this point, particularly when those concerns relate to a deposition over which this Court had no control and with which current defense counsel had no involvement.

[3] The bulk of the report is dedicated to a summary of Lewis's treatment history.

3

Report at 4.)   As discussed below, the Court does not reach the issue of causation in this case because Lewis fails to set forth sufficient evidence of negligence.  Dr. Markiewitz's report, while potentially probative of causation, is not probative of CSX's alleged negligence.  Therefore, the Court need not address Defendant's Motion to Strike Andrew Markiewitz, M.D.'s Causation Opinions and the Court denies that motion as moot.

## II.    MOTION FOR SUMMARY JUDGMENT

### A.    Background

#### 1.    Lewis's Work and Medical History[4]

Lewis, who is currently fifty-six years old, has worked in the railroad business for approximately thirty-seven years, beginning in 1973 and continuing through at least April 2010. He has worked in the Track Department for that entire time period, beginning his employment as a trackman.  (Lewis Dep. 13:15-14:1.)  For a twelve- to thirteen-year period prior to 2006, Lewis worked as a machine operator on a production gang that traveled from state to state to install railroad ties and service the tracks at different locations. (*Id*. at 14-17, 20.)  During that period, his primary task was operating a machine known as a "ballast regulator."  (*Id*. at 14:5-14:8, 17.) A ballast regulator is a machine used to redistribute "ballast," the gravel that surrounds the

---

[4] The Court primarily bases Part I.A of this Order on Plaintiff Lewis's deposition and on the exhibits to Plaintiff's Response and Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (Doc. 51), including the Deposition of Plaintiff Lewis (Doc 51-4).  Where appropriate, the Court also relies on Defendant's Proposed Findings of Undisputed Fact (Doc. 44) to the extent Plaintiff admits those facts in his responses (Docs. 45-1, 47-1, 51-1). In his Response and Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, Plaintiff recites a number of alleged "facts" for which he provides few citations to the evidentiary record.  As stated below in the Court's recitation of the legal standard governing motions for summary judgment, this Court cannot simply assume that the factual assertions made by parties in their pleadings are true.  Accordingly, the Court neither repeats herein nor considers any factual assertions that were not supported by citation to the evidentiary record or admitted by Plaintiff in his responses to Defendant's Proposed Findings of Undisputed Fact.

railroad ties and forms the track bed.  (*Id*. at 21-24.)  The operator sits in the main part of the machine, the "cab," and manipulates the machine using a number of different hand levers.  (*Id*.)  During his deposition, Lewis indicated that the amount of force required to move the levers varies:

> Well, it all depends on which one it is.  Some of them are heavy and they got the levers so close together you can't use them with your whole hand.  You got to grab them with your fingers and push them and pull them like that (indicating).  It draws a lot of calluses on your hand.

(*Id*. at 25:2-25:8.)  Newer ballast regulators are controlled by joysticks rather than levers and can be easier to operate.  (*Id*. at 25.)  Lewis testified that he began to see the newer regulators in 2001 or 2002.  (*Id*. at 26.)  However, it is unclear how quickly the new regulators were phased in.  According to Lewis, both the older and newer regulators generally were in good working condition.  (*Id*. at 41.)

While stationed in a particular area, Lewis and the other employees assigned to his team stayed in a hotel.  (*Id*. at 17.)  They normally were scheduled to work four ten-hour days, with three days off.  (*Id*.)  However, they often worked overtime in order to meet deadlines.  (*Id*. at 34-36.)  Each day started with a thirty-minute safety meeting, followed by a number of warm-up exercises.  (*Id*. at 19.)  The team members then checked the equipment and performed any necessary maintenance before beginning their work on the tracks.  (*Id*. at 19-20.)  Aside from short bathroom breaks and a thirty-minute lunch period, Lewis spent most of his day sitting in the ballast regulator cab.  (*Id*. at 22, 33.)  He analogized the nature of the team's approach to servicing the tracks to an assembly line: Certain team members install the railroad ties first.  Then other team members operate machines called "tampers," which run along the track, raising it up so that it sits on top of the ballast.  The ballast regulators run behind the tampers.  (*Id*. at

5

24.)  Working in that fashion, the team can cover two to three miles of track per day.  (*Id.* at 27.)

Lewis cannot recall precisely when he first experienced problems with his hands.  (*Id.* at 11-12.)  He first noticed tingling in his pinky and ring fingers.  (*Id.* at 8.)  Occasionally, he also felt the tingling in the palm of his hand.  (*Id.*)  The tingling was accompanied by soreness in his elbow and a loss of grip strength.  (*Id.* at 8-9.)  On November 22, 2002, Lewis attended a medical screening in Covington, Kentucky, during which he and other railroad employees were tested for carpal tunnel syndrome and other occupational injuries.[5]  The screening was sponsored by Hannon & Joyce, a former partnership involving Lewis's attorney, Thomas Joyce, and another attorney, Greg Hannon.[6]

After the screening, Lewis followed up with his family physician and was referred to hand surgery specialist, Andrew D. Markiewitz, M.D., of Cincinnati, Ohio.  (*Id.* at 55-56.)  When he first visited Dr. Markiewitz on October 20, 2003, Lewis indicated that he sometimes experienced soreness in his elbows and hands while driving.  He also experienced tingling and numbness in his hands and stated that his elbows hurt when lifting more than five or ten pounds.  The symptoms had been occurring for at least a year.  (Medical Records of Dr. Markiewitz, Doc.

---

[5] Information regarding the November 22, 2002 screening comes from the portion of Defendant's Proposed Findings of Undisputed Fact (Doc. 44) regarding Defendant's Motion for Sanctions for Spoliation of Evidence and Plaintiff's Response in Opposition to Defendant's Proposed Findings of Undisputed Fact with regard to the same (Doc. 45-1).

[6] Hannon & Joyce sponsored several similar medical screenings for railroad employees. The law firm advertised the screenings through flyers indicating the date and location of the screening, the types of testing being offered for railroad employees, and Hannon & Joyce's offer to represent the employees for any viable FELA injury claims.  In this case, Lewis received a flyer through the mail.  (Lewis Dep. 52.)

51 Ex. A at 1.)[7]  Lewis underwent EMG/NCV testing, which confirmed bilateral carpal tunnel syndrome.  (*Id.* at 4; Medical Report of Dr. Markiewitz, Doc. 51 Ex. B at 2-3.)[8]  Lewis saw Dr. Markiewitz again on November 7, 2003 to discuss the results of EMG/NCV.  During that visit, Dr. Markiewitz assessed possible cervical spine issues, bilateral carpal tunnel syndrome, and nerve root irritation, and recommended an MRI of the neck.  (Markiewitz Records at 4; Markiewitz Report at 3.)  After getting the MRI results, Dr. Markiewitz concluded that Lewis's cervical spine condition may have contributed to his hand and arm issues.  Accordingly, Dr. Markiewitz recommended that Lewis see another doctor for a neurosurgical consultation before proceeding with any surgery on his arms.  (Markiewitz Records at 5; Markiewitz Report at 3.)

Lewis did not return to Dr. Markiewitz until September 16, 2005, almost two years later.  (Markiewitz Report at 3.)  Lewis indicated at that time that he was still experiencing problems with his hands.  He could not remember if he had seen another doctor for a neurosurgical consultation anytime between November 2003 and September 2005.  He had decided that he did not want to consider neck surgery.  Instead, he wanted to proceed with treatment of his carpal tunnel syndrome even if the treatment would not completely relieve his symptoms.  (Markiewitz Records at 5-6; Markiewitz Report at 3.)  On October 18, 2005, and November 15, 2005, Dr. Markiewitz performed two carpal tunnel release surgeries on Lewis.  (Markiewitz Records at 7; Markiewitz Report at 3.)  The procedures were apparently successful and have provided Lewis with relief from carpal tunnel syndrome.  (Markiewitz Report at 4.)

---

[7] Hereinafter, the Court refers to the Medical Records of Dr. Markiewitz as "Markiewitz Records."

[8] Hereinafter, the Court refers to the Medical Report of Dr. Markiewitz as "Markiewitz Report."

As a result of his carpal tunnel syndrome, Lewis took a leave of absence from work from approximately October 18, 2005 through December 16, 2005. (Lewis Dep. 58.) Prior to taking leave, Lewis never expressed concern to anyone at CSX that the type of work he was doing or the equipment he was using was causing him to experience hand problems. (*Id*. at 36-37.) Lewis filed the instant lawsuit on November 9, 2005 while he was out on medical leave.

### 2. CSX's General Approach to Dealing with Cumulative Trauma Disorders

The general crux of Lewis's FELA negligence claim is that CSX did not do enough to ameliorate risks or alter working conditions that eventually caused Lewis to develop carpal tunnel syndrome. Lewis relies on the deposition testimony of Weldon, Dr. Cook, and Snider, to paint a picture of CSX's treatment of cumulative trauma disorders, such as carpal tunnel syndrome, over the past twenty to thirty years. Because Weldon, Dr. Cook, and Snider were not actually deposed in the context of this case, large portions of their testimony are irrelevant to the instant case, and the portions that are relevant address CSX's responses to cumulative trauma disorders in very broad terms and generalizations.

The three individuals work or worked in different departments or divisions of CSX – the claims department, the medical department, and the safety department respectively. The three departments function independently for the most part. For example, they each maintain their own databases. (Weldon Dep. 43:2-10, 47:9-17, 59:15-60:7.) However, they do interact occasionally to address safety issues. (*Id*. at 80:2-4.)

As indicated above, the first deponent, Weldon, is the current Director of General Claims for CSX's claims department. (*Id*. at 5:17-20.) The primary role of the claims department is to assist in defending CSX against lawsuits brought by employees and to oversee payment of

employees' medical bills for work-related injuries.  (*Id*. at 18:17-23, 41:4-21.)  The department also maintains a database of injury claims filed by employees.  (*Id*. at 19:7-16.)

The second deponent, Dr. Cook, was the Associate Chief Medical Officer for CSX between 1991 and 2000.  Between 2000 and his retirement in 2003, he served as the Chief Medical Officer.  One of the responsibilities of employees of CSX's medical department is to evaluate certain occupational conditions, such as air quality or noise conditions.  (Cook Dep. 25-26.)  Dr. Cook did not personally perform such evaluations; rather, he oversaw medical department staff who coordinated with industrial hygienists to conduct the evaluations.  (*Id*.)

The third deponent, Snider, was the Director of Safety for CSX from 1987 to May 2006.  (Snider Dep. 8:7-9.)  While serving in that capacity, Snider helped develop and implement numerous training programs including programs called "Pro Back," "Back in Motion," and "Body in Motion."  (*Id*. at 12:16-13:9.)  Just before he retired, he also worked with a doctor to develop a soft-tissue injury prevention program to address an increase in complaints of muscle sprains and strains.  (*Id*. at 13:10-18.)  Snider interacted regularly with various safety committees and directly assisted with problems or questions that arose when employees were injured in the field.  (*Id*. at 16:6-12.)

Snider was also responsible for overseeing the annual certifications of CSX's work sites[9] and compiling statistics on injuries resulting from accidents that employees experienced in the field.  (*Id*. at 16:13-17, 25:3-28:1, 30:22-32:17.)  Snider distinguished injuries that manifest either immediately or soon after to an identifiable incident from injuries that develop over time,

---

[9] Every CSX work site has to be certified annually by the safety department. Certification entails verifying that employees are using the correct tools, that the tools are in good condition, that employees are conducting the mandatory safety meetings, and that all training is up to date.  (Snider Dep. 25:3-28:1, 30:22-32:17.)

such as cumulative trauma disorders. (*Id.* at 59:24-61:12. During his time at CSX, the safety department focused on incident-based injuries, while the medical and claims departments dealt with the cumulative trauma disorders and other physical conditions that manifested after years of labor.[10] (*Id.*) Nonetheless, Snider sometimes worked with the medical department to look into potential safety issues. (*Id.* at 16:18-23.) He also coordinated with the medical department to place employees returning from medical leave in positions that accommodated their disability or medical condition. (*Id.* at 16:25-17:6.)

Neither Dr. Cook, Snider, nor Weldon appear to have had much direct involvement in studying or developing training related to carpal tunnel syndrome. (*See* Cook Dep. 28:20-29:5; Weldon Dep. 54:5-55:11.) Instead, all three men pointed to a fourth individual, Todd Brown,[11] as carrying the primary responsibility for investigating the occurrence of cumulative trauma or musculoskeletal disorders amongst CSX employees. (*See* Cook Dep. at 29-30; Weldon Dep. 11:19-12:21, 19:22-20:11; Snider Dep. 17:10-20.)

CSX hired Brown, an ergonomist,[12] in 1993 or 1994 in response to an increase in claims stemming from cumulative trauma disorders. (Cook Dep. 30; Weldon Dep. 33:1-7, 55:1-11, 99:7-21, 100:1-6.) Beginning in 1994, the number of yearly carpal tunnel syndrome claims increased from under an average of fifty to 534. (Weldon Dep. 24:1-25:5.) Each year thereafter,

---

[10] As a result, Snider usually did not receive notice of the claims being filed with the claims department. (Snider Dep. 15:13-16:2.)

[11] Lewis did not depose Brown. Brown may have been deposed in the context of another case. (*See* Snider Dep. 18:8-16.) However, Lewis did not provide that deposition transcript in this case.

[12] Brown holds a Ph.D., presumably in ergonomics or a field related to ergonomics. (Weldon Dep. 61:12-19.)

10

CSX saw similar numbers of carpal tunnel claims, ranging from approximately 300 to 900 claims per year.  (Weldon Dep. 24:1-31:13.)  Those numbers reflect carpal tunnel syndrome claims from all CSX employees.  Neither Weldon nor any other witness testified as to the breakdown of claims based on the craft, position, or tasks regularly performed by the employees filing carpal tunnel syndrome claims.[13]

Brown's task was to evaluate the work performed by CSX employees to determine whether any subset of employees might be more susceptible to developing carpal tunnel syndrome due to their working conditions.[14]  (*See* Cook Dep. 28:20-30:15; Weldon Dep. 33:1-7, 55:1-11; Snider Dep. 36:21-25.)  Brown's position was based in the medical department,[15] but he also worked with people from the claims and safety departments.  Brown attended safety committee meetings and received information from the claims department regarding carpal tunnel syndrome claims filed by employees.  (Cook Dep. 42:1-2; Weldon Dep. 60:25-61:11.)  He also reviewed scientific literature discussing labor conditions that may contribute to upper extremity cumulative trauma disorders, and he spent time in the field observing the various tasks

_____

[13] During his deposition, Weldon was asked about claim summaries that apparently break down the claims by craft, type of injury, date of incident, incident number, and venue where the case is pending.  (Weldon Dep. 44:10–22, 63:25-65:20, 67:16-68:2.)  His testimony suggests that such information is available.  However, Lewis did not provide any of the summaries referred to during Weldon's deposition, and Weldon did not testify as to the content of those summaries.  Further, Weldon testified that he was not in charge of preparing or reviewing the summaries of carpal tunnel syndrome claims.  (*Id.* 45:25-46:21.)  Instead, Weldon works mostly with asbestos claims.  (*Id.*)

[14] Prior to CSX hiring Brown, other individuals from the safety and medical departments would have been responsible for examining carpal tunnel syndrome risk factors.  (Weldon Dep. 100:7-101:11; Cook Dep. 30:16-31:8.)

[15] Brown reported directly to Dr. Cook during the brief period when Dr. Cook served as the Chief Medical Officer.  (Cook Dep. 31:9-22.)

11

the railroad workers performed and the tools they used.  (Weldon Dep. 73:18-22, 74:14-22; Cook

Dep. 40:18-25; Snider Dep. 18:8-16.)  In general, Brown found that the nature of work engaged

in by CSX employees differed from forms of repetitive force labor seen in other industries that

experienced high incidences of carpal tunnel syndrome.  (Cook Dep. 64:10-65:6.)

When Brown did identify potential risk factors in the work of railroad employees, he

tried to find ways to ameliorate those risks.  (*Id*. at 40:13-25.)  For example, he looked into

equipment such as anti-vibration gloves or anti-vibration seats to lessen workers' exposure to

excessive vibration.  (*Id*. at 40:13-20.)  On some occasions, Brown worked with outside

consultants, such as Dr. Morton Kasdan, a hand surgeon whom CSX retained to provide expert

advice in dealing with cumulative trauma disorders.[16]  (Weldon Dep. 15:1-21, 99:7-21, 102:2-4.)

While Dr. Cook was the Associate Chief Medical Officer, he assisted Brown's research

into the ergonomic risk factors associated with carpal tunnel syndrome by gathering medical

information related to the employees' claims.  (Cook Dep. 33:11-43:1.)  During that time, Dr.

Cook wrote letters to employees who had reported a problem requesting that the claimants

describe their injuries and work conditions and provide information regarding their diagnoses,

their doctors' recommendations, and any tests or surgeries they may have had.  (*Id*. at 34:4-

35:13.)  Dr. Cook estimated that he sent out at least a thousand letters during the few years he

worked with Brown.[17]  (*Id*. at 36:23-37:5.)  In the overwhelming majority of cases, the only

---

[16] CSX began working with Dr. Kasdan as early as during the 1980s, when Dr. Kasdan gave a presentation to people in various departments at CSX, including the claims and medical departments, about the possible causes of carpal tunnel syndrome.  (Weldon Dep. 15:1-21.)

[17] Even when he was not working to collect information for Brown, Dr. Cook contacted individuals who had reported cumulative stress injuries in order to make sure they were properly evaluated before returning to work.  If and when the employees did return to work, Dr. Cook had to make sure that they were assigned to appropriate positions based on their physicians'

response he received from the employee was a letter from the employee's attorney.[18] (*Id.* at 35:14-19.) Dr. Cook generally did not attempt to make any further direct contact with those employees. (*Id.* at 36:2-22.)

Dr. Cook consulted with Brown a few times. However, Brown ultimately indicated that there was nothing more for Dr. Cook to do at that time and that he would continue working with people from the safety department to investigate any issues. (*Id*. at 37:22-38:6.) According to Dr. Cook, Brown "took on the responsibility himself" to address any problems related to carpal tunnel syndrome and to the extent that Brown needed assistance from others in the medical department, people were available to help him. (*Id*. at 38:7-18.)

In 2005, Brown worked with Snider to develop a formal exercise program involving warm-up stretches and posture relief movements. (Snider Dep. 19:2-21:17.) The program was not necessarily geared toward the prevention of carpal tunnel syndrome but was developed using some of the information and data Brown collected while researching cumulative trauma disorders. (*Id*. at 19:2-20:1.) CSX employees had been doing similar warm-up and stretching exercises for years. (*Id*. at 21:18-22:2.) Snider and Brown incorporated some of those exercises into the new program and formulated specific routines that employees could do prior to engaging in certain activities. (*Id*.)

During his deposition, Snider was asked if he ever specifically examined the amount of force, vibration, repetition, or awkward posturing that various railroad tasks entailed. Snider

---

recommendations and any work restrictions they may have been under. (Cook Dep. 49:11-50:23.)

[18] Dr. Cook recalled receiving only four or five responses directly from employees rather than from an attorney. (Cook Dep. 35:19-24.)

responded that when doing work site certifications at track locations, he and other members of the safety team always "looked for anything that the employee was doing that might be uncomfortable to them or might cause an injury in a short term or long term.  That's not something we focused on, but you always look for things like that."  (Snider Dep. 33:22-34:8.) For example, on one occasion, he noticed that a particular tool, an "impact gun," was difficult for employees to use because it involved a lot of vibration.  (*Id*. at 37:2-13.)  Snider worked with another individual from the medical department to improve the tool and they ended up altering the gun and adding a counterbalance in order to make the gun lighter and easier to handle.  (*Id*. at 37:14-21.)  He could not recall ever noting a problem with repetitive motion in any of the tasks he examined.  (*Id*. at 36:8-9.)  He was, however, aware of concerns regarding cumulative trauma disorders that the medical department was looking into and stated that Brown was observing employees while they worked to try to identify potential problems.  (*Id*. at 36:10-25.)

**B.    Legal Standard**

Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Summary judgment is appropriate if "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  On a motion for summary judgment, the movant has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).  The nonmoving party must provide more than a scintilla of evidence.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  That is, the nonmoving party must present sufficient evidence to permit a reasonable

14

jury to find in that party's favor.  *Id.*

The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment."  *Anderson*, 477 U.S. at 257.   The Court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Liberty Lobby*, 477 U.S. at 249.

The Court carefully reviews "those portions of the submitted evidence designated by" both parties.  *Guarino v. Brookfield Twp. Tr's.*, 980 F.2d 399, 410 (6th Cir. 1992); *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . .").  Although the Court "may consider other materials in the record," Fed. R. Civ. P. 56(c)(3), the Court will not "sua sponte comb the record from the partisan perspective of an advocate for the non-moving [or moving] party."  *Guarino*, 980 F.2d at 410.

## C.    Analysis

Defendant CSX moves for summary judgment on three grounds.  First, CSX attacks the merits of Lewis's claim, arguing that Lewis cannot prove that CSX was negligent or that Lewis's employment caused his injury.  Defendant then argues that Lewis's claim is time-barred.  The Court addresses those arguments in reverse order, beginning with the statute of limitations defense.

### 1.    Statute of Limitations

15

A plaintiff asserting a claim under FELA must file suit within three years from the date that the claim accrued. 45 U.S.C. § 56. A cause of action generally accrues "when there has been a violation of legally protected interests," or "when the tortious event is committed." *Hicks v. Hines Inc.*, 826 F.2d 1543, 1544 (6th Cir.1987). However, "some injuries and causes are so latent as to elude discovery at the time of the injury-causing event." *Fonseca v. Consolidated Rail Corp.*, 246 F.3d 585, 588 (6th Cir. 2001). Therefore, depending on the type of injury, whether immediately manifesting or latent, the Sixth Circuit applies one of two rules – the time-of-event rule, or the discovery rule:

> Under the time-of-event rule, a cause of action is considered to have accrued the moment a tortious act occurs if greater than de minimus harm is discernable at the time of the tortious event. The time-of-event rule applies to situations in which a traumatic event occurs, resulting in a noticeable injury, even if the full manifestation of the harm remains latent.
>
> In contrast to the time-of-event rule, the discovery rule is applied when no significant injury is discernable at the time of the tortious event, or if the cause of an injury is not apparent. Under the discovery rule, a cause of action is deemed to have accrued when the plaintiff reasonably should have discovered both cause and injury. A prototypical discovery-rule case is one in which an occupational disease remains dormant long after a plaintiff is exposed to the causes of the injury.

*Id*. (internal citations and quotation marks omitted).

The latter rule applies to this case because the alleged injury in this case cannot be tied to any specific tortious event. Rather, Lewis alleges that he developed carpal tunnel syndrome over a number of years due to repeated exposure to unsafe working conditions. It is unclear from the evidence when Lewis first began to experience pain and numbing in his hands. However, based on his representations to Dr. Markiewitz and his responses to an occupational questionnaire that Lewis completed at the November 22, 2002 medical screening conducted by Hannon & Joyce,

16

Lewis appears to have experienced symptoms at least as far back as March 2002.  (*See* Doc. 39, Ex. B at 16.)  Lewis filed this case on November 9, 2005, more than three years after he first discovered the injury – the symptoms of carpal tunnel syndrome.  However, the date when Lewis reasonably should have discerned that his injury was caused by his job remains unclear.

During the discovery period, CSX requested certain documents and information related to Lewis's attendance at the November 22, 2002 medical screening.  The requested discovery included, among other things, the flyers used to advertise the screening and an occupational questionnaire that Lewis completed at the screening.  (*See id.*, Ex. B at 7.)  Lewis produced the questionnaire, but he did not produce any of the requested flyers.  CSX also argues that Lewis should have disclosed the identity of all other persons, whether attendees or medical professionals, present at the November 22 screening.[19]

Defendant believes that the flyers and list of screening attendees would have proven or would have led to additional evidence that could have proven Lewis knew or should have known that the pain he had been experiencing was work-related.  CSX bases this belief largely on the fact that it has successfully asserted a statute of limitations defense in another case involving similar facts.[20]  In that case, *Wankmiller v. CSX Transp., Inc.*, the plaintiff produced at least one flyer advertising a Hannon & Joyce screening he attended.  (*Id.*, Ex. A at 66-67.)  The first page of the flyer advertised free testing for "occupationally related injuries."  On the second page, the

---

[19] In a separate motion, Defendant requested that the Court sanction Plaintiff for spoliation of evidence due to Plaintiff's failure to maintain all records related to the November 22, 2002 screening.  (Doc. 43.)  The Court orally denied that motion during a hearing on May 25, 2010.

[20] *See Wankmiller v. CSX Transportation, Inc.*, Case No. A0409719 (Hamilton County, Ohio Court of Common Pleas); Doc. 39, Ex. A (containing documents related to *Wankmiller*).

flyer states in relevant part:

> The Law Firm of HANNON & JOYCE is Conducting a Medical Screening for all Railroad Workers.
>
> If you work in awkward postures; perform forceful, repetitive work; work with vibrating tools or machinery; perform work that requires extreme amounts of heavy lifting, bending, twisting, crawling, stooping or climbing; walk on uneven ballast – you could be suffering from one or more of the following work related injuries.
>
> CARPAL TUNNEL SYNDROME – a common and troublesome condition that interferes with the use of the hand.  Symptoms include pain, numbness, tingling, and weak grip – causing you to drop things.  These symptoms can happen anywhere and anytime, at home or at work.  Most often, however, symptoms begin by waking you up at night.  (Employees separated from the railroad more than three (3) years do not qualify to be tested.)

(*Id.*)  CSX relied primarily on the flyer and on Wankmiller's responses to an occupational questionnaire to demonstrate that as of the date Wankmiller first contacted Hannon & Joyce about the screening, he knew or should have known that his injuries were work-related.[21]

Defendant CSX argues that if Lewis had produced the flyer that Hannon & Joyce used to advertise the November 22, 2002 screening, CSX could similarly demonstrate that Lewis's claims were time-barred.  Lewis admitted that he received a flyer through the mail, but could remember little else about the flyer.  CSX surmises that the flyer Lewis received was similar to the flyer produced in *Wankmiller*.  However, in light of the lack of evidence in this case

--------

[21] In its motion for summary judgment in *Wankmiller*, CSX argued:

> The exemplar flyer he reviewed at his deposition made it abundantly clear the screening was for railroad employees.  Hannon & Joyce was "fishing" for "occupationally related" . . . injuries . . .. The screening was for the purpose of presenting claims against the railroads.  Wankmiller knew the purpose of the screenings.

(Doc. 39, Ex. A at 77-78.)

18

revealing the information contained on the flyer for the November 22, 2002 screening and the date that Lewis may have received that flyer, CSX fails to show that the statute of limitations has run in this case.  Even if Lewis were to find and produce the flyer and it was similar to the flyer Wankmiller received, CSX would still have to show that Lewis received the flyer prior to November 9, 2002.  At this point, there simply is insufficient evidence to prove that Lewis knew or should have known his injuries were caused by work conditions prior to that date.

### 2.    FELA Prima Facie Case

In addition to arguing that Lewis's claim is time-barred, CSX also argues that Lewis lacks sufficient evidence to succeed on the merits of his claim.  As the basis for his FELA claim, Lewis alleges that exposure to occupational risk forces, including "repetition, force, vibration and/or awkward postures," during his work on the railroad caused or contributed to his development of bilateral carpal tunnel syndrome.

FELA provides a cause of action for any person injured while employed by a "common carrier by railroad" where the injury "result[ed] in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment."  45 U.S.C. § 51.  In enacting FELA, Congress intended the statute to be a departure from common law principles of liability as a "response to the special needs of railroad workers who are daily exposed to the risks inherent in railroad work and are helpless to provide adequately for their own safety."  *Aparicio v. Norfolk & W. Ry. Co.*, 84 F.3d 803, 807 (6th Cir. 1996).  Nonetheless, FELA is not a workers' compensation or strict liability statute, and a  plaintiff cannot recover simply because he was injured in the course of his employment.

19

*Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 543 (1994) ("FELA does not make the employer the insurer of the safety of [its] employees while they are on duty. The basis of [its] liability is negligence, not the fact that injuries occur.").

There are two basic methods of proving liability in a FELA case.  First, a "plaintiff may demonstrate liability as a matter of law if he or she proves that a railroad company violated a safety statute that establishes an absolute duty on the railroad company." *Borger v. CSX Transp., Inc.*, 571 F.3d 559, 563 (6th Cir. 2009).  The second method requires the plaintiff to essentially prove common law negligence, albeit with a modified standard for causation.  In this case, Lewis has not alleged a violation of a safety statute.  Therefore, in order for him to prevail on his claim, he must prove the 'traditional common law elements of negligence: duty, breach, foreseeability, and causation.'" *Id*. (quoting *Adams v. CSX Transp., Inc.*, 899 F.2d 536, 539 (6th Cir. 1990)).

In order to present a prima facie case under FELA,

[a] plaintiff must present *more than a scintilla of evidence* to prove that (1) an injury occurred while the plaintiff was working within the scope of his or her employment with the railroad, (2) the employment was in the furtherance of the railroad's interstate transportation business, (3) the employer railroad was negligent, and (4) the employer's negligence played some part in causing the injury for which compensation is sought under the Act.

*Aparicio*, 84 F.3d at 810 (emphasis added).[22] In the prima facie FELA case, the elements of a general negligence claim are split between the third and fourth prong, and, as represented in the fourth prong of the test, FELA imposes a lesser burden of proof with regard to causation. Recently, the Sixth Circuit clarified that the relaxed standard of proof applicable to the causation element does not lessen a plaintiff's burden with regard to the other elements of negligence:

> Van Gorder correctly contends that FELA relaxes a plaintiff's standard of proof regarding causation. *Rogers v. Missouri Pacific RR. Co.*, 352 U.S. 500, 506 (1957) (ruling for the plaintiff-employee and stating that, under FELA, the "test of a jury case is whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury."). Therefore, *if* Grand Trunk were negligent, Van Gorder need only show that its negligence contributed even slightly to his injury. But, contrary to Van Gorder's assertions, the relaxed causation standard under FELA does not affect his obligation to prove that Grand Trunk was in fact negligent. *Perkins v. American Elec. Power Fuel Supply, Inc.*, 246 F.3d 593, 598-99 (6th Cir. 2001). FELA does not lessen a plaintiff's burden to prove the elements of negligence.

*Van Gorder v. Grand Trunk W. R.R., Inc.*, 509 F.3d 265, 269 (6th Cir. 2007) (internal citations modified).

Applying the prima facie test to this case, Lewis easily meets the first two prongs. It is undisputed that Lewis developed carpal tunnel syndrome during the course of his employment with CSX, and that he was furthering CSX's interstate transportation business while working as

---

[22] There is a difference of opinion among the circuit courts as to the quantum of evidence required to survive summary judgment on a FELA claim. The Seventh Circuit, for example, requires only a scintilla of evidence or slight evidence of negligence. *See Harbin v. Burlington N. R. Co.*, 921 F.2d 129, 131 (7th Cir. 1990). Other circuits have rejected the slight evidence standard. *See Mullahon v. Union Pac. R.R.*, 64 F.3d 1358, 1364 (9th Cir. 1995) (rejecting the scintilla rule and stating that the test for submitting a FELA claim to a jury is whether it is "not outside the possibility of reason" that the evidence supports the plaintiff's case) (citation omitted); *Brown v. CSX Transp., Inc.*, 18 F.3d 245, 248 (4th Cir. 1994) (adopting a "substantial evidence" standard). In *Aparicio*, the Sixth Circuit adopted a "more than a scintilla of evidence" standard, thus requiring something more than slight evidence, but not much more. 84 F.3d at 810.

a trackman and machine operator.  The third and fourth prong of the prima facie case remain in

dispute.  Specifically, CSX argues that Lewis fails to set forth more than a scintilla of evidence

demonstrating that CSX was negligent and that Lewis presents no admissible proof of a causal

connection between any aspect of his employment and his injury.  The Court turns first to the

question of CSX's negligence.

### a.    CSX's Negligence

Courts have long recognized that under FELA, railroads have the duty to provide their

employees with a reasonably safe workplace.  *Van Gorder*, 509 F.3d at 269.  That "does not

mean that a railroad has the duty to eliminate all workplace dangers."  *Id.*  Rather, a railroad only

has the duty "to use ordinary care under the circumstances" or "to do what a reasonably prudent

person would have done under the circumstances to make the working environment safe."  *Id.*

"[A] railroad breaches its duty to employees by failing to provide a safe working environment if

it knew or should have known that it was not acting adequately to protect its employees."

*Aparicio*, 84 F.3d at 811.

Lewis alleges that CSX breached its duty to provide a reasonably safe workplace by

failing to provide him with: (1) adequate assistance or manpower; (2) adequate tools and

equipment to safely perform his job duties; and (3) a timely and adequate comprehensive safety

program to prevent or reduce the risk of carpal tunnel syndrome.

### i.    Adequate Tools and Equipment

During the years preceding his diagnosis of carpal tunnel syndrome, Lewis worked as a

machine operator for CSX.  Lewis spent most of his day sitting in the cab of a ballast regulator

pulling various levers, some of which were difficult to grasp because he could not fit his whole

22

hand around them. Lewis testified that the newer ballast regulators are easier to use than the

older machines because they are controlled by joysticks rather than by levers and less force is

required to move the joysticks than was required to move the levers. (Lewis Dep. 25.)

Lewis never clearly fleshes out his argument that CSX failed to provide him with

adequate tools and equipment, so the Court can only guess at the basis for that argument. Lewis

admitted during his deposition that the ballast regulators generally were in proper working

condition:

> Q. And like speaking again about the ballast regulators were they, were they
> generally, I know some of them are older, some are newer, were they generally
> working properly?
> A. Yeah, they was working properly.

(*Id*. at 41.) His argument, therefore, does not appear to be that CSX failed to properly maintain

its equipment or that he was forced to use equipment that did not actually work as intended. At

another point when asked whether the ballast regulators he operated were in "good working

order," Lewis responded:

> I can't say that. We had, we had two pretty decent ones and they took them off
> and gave us two old ones, went back to the old ones with the levers like there.
> But I'm just, I don't, this is my first year off of them. When I came back off of
> my surgery I couldn't do it and so I took a different machine.

(*Id*. at 39-40.) Lewis seizes on those few lines as proof that he was given inadequate equipment,

leading this Court to believe that his main argument is that the old ballast regulators were

inherently unsafe or that CSX was negligent in requiring him to use the old ballast regulators

because it was hard for him to grasp the levers.

To the extent that is Lewis's argument, he fails to support it with evidence. Lewis's

testimony describing the physical demands of operating a ballast regulator – specifically, that he

23

was required to pull and push levers on a repeated basis throughout the day and that it was sometimes difficult for him to fully grip the levers, requiring him to place his hands in awkward positions – shows only that Lewis may have experienced difficulty performing the normal functions of his job.   Without more, his testimony is not evidence that his job was unreasonably unsafe or that CSX required him to perform that job in an unreasonably unsafe manner.  *See Parson v. CSX Transp., Inc.*,  714 F. Supp. 2d 839, 843-84 (N.D. Ohio 2010) (noting that a railroad is not under a duty to eliminate all risks and the plaintiff could not recover simply by showing that walking in the yard on inherently uneven surfaces or climbing on and off equipment – tasks that were "merely 'part of the work'"–  caused her injury; rather, the plaintiff needed to show that the conditions she faced were *unreasonably* unsafe);  *Tootle v. CSX Transp., Inc.*, No. CV 509-031, 2010 WL 4269119, at * 4 (S.D. Ga. Sept. 3, 2010) (finding that the plaintiff's "testimony as to the physical demands of her position is only a description of her job and is not evidence that she [was] required to perform her job in an unsafe manner" (internal quotation marks omitted)); *Zarecki v. Nat'l R.R. Passenger Corp.*, 914 F. Supp. 1566, 1572 (N.D. Ill. 1996) (the plaintiff's description of her work activities was not sufficient, by itself, to establish that those activities were unsafe).  Similarly, the mere fact that Lewis felt that the new ballast regulators were easier to use than the old ballast regulators does not indicate that the old ballast regulators were inherently or unreasonably unsafe.  *See McKennon v. CSX Transp., Inc.*, 897 F. Supp. 1024, 1027 (M.D. Tenn. 1995), *aff'd*, 56 F.3d 64 (6th Cir. 1995) ("The fact that there may have been an automated, or safer method, of work does not automatically render the chosen method unsafe or negligent for purposes of FELA.  Under FELA, the proper inquiry is whether the method prescribed by the employer was reasonably safe, not whether the employer

24

could have employed a safer alternative method for performing the task." (internal citation omitted)); *Soto v. S. Pac. Transp.*, 644 F.2d 1147, 1148 (5th Cir. 1981) ("That there are other, arguably more advanced, methods in use by the defendant for [accomplishing the task at hand] is of no significance where the method in use by [the plaintiff] was not an inherently unsafe one.").

Lewis asks this Court to consider a report published by the National Institute of Occupational Safety and Health (NIOSH) and the Centers for Disease Control (CDC) in 1997[23] – *Musculoskeletal Disorders and Workplace Factors, A Critical Review of Epidemiological Evidence for Work-Related Musculoskeletal Disorders of the Neck, Upper Extremity, and Low Back* – presumably as evidence that any task involving repetition, force, and awkward or extreme postures[24] carries a heightened risk for developing carpal tunnel syndrome. (Doc. 51 at 3-4.) The excerpt that Lewis relies upon does mention those factors, but it does not address the amount of force or repetition that would place someone at risk for developing carpal tunnel syndrome or provide insight into what postures might be considered awkward or extreme. The excerpt specifically states that meatpackers, poultry workers, and automobile assembly workers may be more likely to develop carpal tunnel syndrome, but it says nothing about railroad workers or heavy machinery operators. Lewis cites to no expert testimony explaining the significance of the NIOSH/CDC report to the particular facts of this case. Without such testimony, the report sheds little light on the risk factors associated with operation of a ballast regulator. There is no evidence that that task requires the type of force, repetition, and awkward

---

[23] Lewis did not actually provide the Court with a copy of the NIOSH/CDC report. He excerpts a portion of the report in his Response and Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment. (Doc. 51 at 3-4.)

[24] The NIOSH/CDC report refers to "extreme postures" as a risk factor but does not define that term. (Doc. 51 at 3-4.)

or postures considered in the report. Additionally, the Court has no idea if this particular

NIOSH/CDC report, which was published almost fifteen years ago, continues to be consistent

with current scientific research into carpal tunnel syndrome.[25] Accordingly, the report is not

sufficient to create a jury question as to the safety of the tools and equipment CSX provided

Lewis or the conditions under which Lewis was required to work. *See Doty v. Ill. Cent. R.R.*

*Co.*,162 F.3d 460, 462 (7th Cir. 1998) (research showing a general link between occupational

stress and carpal tunnel syndrome was insufficient to establish that the plaintiff's particular

workplace was unsafe without well-founded expert testimony addressing the specific conditions

of the plaintiff's workplace or the type of tools the plaintiff had to use); *cf. Aparicio*, 84 F.3d at

811-12 (describing particularized evidence, including an ergonomist's expert testimony that the

plaintiff's job involved particular risk factors associated with carpal tunnel syndrome and that

there were known remedial measures that the railroad could have implemented, that was

sufficient to permit a jury to conclude that the railroad was negligent).

Finally, even if Lewis had presented sufficient evidence to show that there was some

problem with the equipment or with the manner in which he was required to use the equipment,

there is no evidence that CSX had actual or constructive notice of such a problem. Several

---

[25] Indeed, the scientific literature addressing risk factors or carpal tunnel syndrome is much more complex than Lewis suggests. It appears to be far from settled that all tasks involving repetition, force, and awkward or extreme postures carry a greater risk for carpal tunnel syndrome. *See generally Stasior v. Nat'l R.R. Passenger Corp.*, 19 F. Supp. 2d 835, 848-50 (N.D. Ill 1998) (discussing scientific literature regarding research into carpal tunnel syndrome). Without further analysis of the particular characteristics of Lewis's job, the NIOSH report has little, if any, bearing on this case. *See Magdaleno v. Burlington N. R.R. Co.*, 5 F. Supp. 2d 899, 905-906 (D. Colo. 1998) (discussing the nature of a 1997 NIOSH report that appears to be the same report cited by Lewis and determining that no conclusions can be drawn about a particular workplace without conducting research into a "worker's exposure to the relevant risk factors: force, posture, and repetition").

courts in the Sixth Circuit have indicated that lack of such notice may be fatal to a plaintiff's

FELA negligence claim.  For example, in *Basinger v. CSX Transp., Inc.*, No. 94-3908, 1996 WL

400182, at *5 (6th Cir. July 16, 1996), the Sixth Circuit held that a district court properly granted

summary judgment to CSX where the plaintiff alleged that equipment defects caused his injury

and that evidence that other employees complained about the condition of certain equipment was

sufficient to prove notice for the purpose of summary judgment.  *Id.*  The Sixth Circuit rejected

the plaintiff's argument, noting that without evidence that those "complaints were directed to

supervisory employees whose knowledge could be imputed to CSX, . . . CSX cannot be charged

with knowledge of the alleged defects."  *Id.*; *also compare Jett v. CSX Transp., Inc.*, No. 2007-

162, 2009 WL 899626, at *6 (E.D. Ky. Mar. 31, 2009) (Finding that a FELA plaintiff who

sometimes complained to co-workers but never told supervisors that his work was causing him

shoulder problems could not show that the "defendant should be charged with any knowledge of

allegedly defective work conditions so as to state [a] FELA negligence claim"), *and Johnson v.

Grand Trunk W. R.R., Inc.*, No. 07-CV-11129, 2008 WL 283703, at *5 (E.D. Mich. Jan. 31,

2008) ("[I]f an employer has never received a complaint or report of an injury, courts have found

that a future injury is not foreseeable."), *with Aparicio*, 84 F.3d at 812 (reversing judgment as a

matter of law against the plaintiff on a FELA negligence claim on several grounds, including the

existence of evidence that the plaintiff had notified the defendant railroad company in writing

that he had developed carpal tunnel syndrome due to work and the defendant returned him to the

same job duties without any modifications following his surgeries), *and Fielden v. CSX Transp.,

Inc.*, No. 2:03-cv-995, 2009 WL 2824459, at *2 (S.D. Ohio Aug. 26, 2009) (denying defendant's

motion for judgment as a matter of law in a FELA case involving carpal tunnel syndrome where

the plaintiff testified that he "repeatedly complained, without avail, to his supervisor about his discomfort and his inability to properly operate the machine [to which he was assigned] because of his physical characteristics").  In this case, there is no evidence that Lewis or anyone else ever complained about the equipment.  In fact, Lewis admitted that he never reported to anyone at work that the work he was doing or the equipment he was using was causing him to experience problems with his hands.  (Lewis Dep. 36-37.)

The Court recognizes of course that evidence that a plaintiff had made prior complaints is not the only method of proving that particular equipment was not properly maintained or was inadequate to perform the task at hand in a safe manner.  As discussed above, Weldon's testimony shows that CSX had knowledge that during the mid-1990s an increasing number of its employees filed claims related to carpal tunnel syndrome and that CSX continues to see new carpal tunnel syndrome claims each year.  However, neither Weldon nor any other witness testified as to the jobs those employees held at CSX or the types of tasks they performed, and there is no evidence that any employee operating the same or similar machinery as Lewis filed a carpal tunnel syndrome claim.  Instead, Lewis apparently believes that the mere fact that there were a large amount of claims equates to evidence that his particular working conditions were unsafe and that CSX knew or should have known of the allegedly unsafe conditions. Unfortunately for Lewis, even when viewed in a light most favorable to him, the evidence does not support such a leap.

### ii.    Lack of Adequate Manpower/Assistance

Just as with his inadequate equipment claim, Lewis never actually articulates the basis for his claim that CSX failed to provide him with sufficient manpower or assistance to complete his

28

job.  However, based on the portions of his deposition that he chose to highlight, Lewis's claim appears to rest on the fact that he often had to work overtime to complete certain projects within the scheduled time-frame.  In attempting to prove negligence due to lack of manpower, Lewis runs into the same problems discussed above.

The Sixth Circuit has recognized that "employers must provide workers with sufficient manpower to accomplish an assigned task" as part of their duty to provide a safe work environment.  *Coomer v. CSX Transp., Inc.*, No. 95-6106, 1996 WL 525433, at *2 (6th Cir. Sept. 13, 1996) (citing *Blair v. Balt. & Ohio R.R.*, 323 U.S. 600, 604-05 (1945)).  However, Lewis cannot survive summary judgment simply by showing that more assistance would have made his job easier or would have allowed him to complete his job in a shorter time.  That evidence alone does not mean CSX was negligent for failing to provide such assistance.  *See McKennon*, 897 F. Supp. at 1027 ("[T]he fact that [the p]laintiff's job would have been easier if there had been more workers does not constitute negligence on the part of Defendant, nor does it create an unreasonably unsafe work environment.").  Instead, Lewis must present some evidence, however slight, that the extended hours created an unreasonably unsafe work environment.  If evidence of overtime alone would suffice, any employee who develops a cumulative trauma injury would be able to establish a jury question as to inadequate manpower simply by showing he or she generally worked extended hours.

In most cases where plaintiffs have survived summary judgment on lack of manpower claims, the plaintiffs have presented evidence that they were forced to perform a particular task that usually required more assistance and that under the circumstances, it was unreasonable to require the plaintiff to perform the task without assistance.  *See*, *e.g.*, *Ross v. Chesapeake & O.*

29

*Ry.*, 421 F.2d 328 (6th Cir. 1970) (plaintiff was injured because he was required to lift or drag a 600 pound barrel by himself);  *Hamilton v. CSX Transp., Inc.*, No. 3:08 CV 2601, 2009 WL 3353557, at *3 (N.D. Ohio Oct. 15, 2009) (denying CSX's motion for summary judgment on the plaintiff's FELA negligence claim where there was evidence that the foreman failed to provide the plaintiff with help carrying a 100 pound keg, such assistance was readily available, and CSX knew the risks involved in having an individual lift the 100 pound kegs without assistance); *Beeber v. Norfolk S. Corp.*, 754 F. Supp. 1364, 1372 (N.D. Ind. 1990) (finding sufficient evidence to allow the issue of inadequate assistance to be considered by the jury where the plaintiff showed that although he had recently sustained a hernia injury, his employer assigned him to a 100-car train with only two other employees well knowing that lengthy freight trains have separated in the past and that the repairs would require the plaintiff to lift heavy equipment);  *Montgomery v. CSX Transp., Inc.*, 376 S.C. 37, 43-45, 54-55, 656 S.E.2d 20, 23-24, 29-30 (S.C. 2008) (holding that the plaintiff presented sufficient evidence to raise a jury question as to whether CSX was negligent in failing to provide sufficient manpower where the plaintiff submitted the affidavits of two expert witnesses who stated that it was unreasonable and went against common industry practice for the railroad to assign the plaintiff to a particular task without any assistance).  This court is unaware of any case in which a FELA plaintiff has survived summary judgment on an inadequate assistance or lack of manpower claim based solely on the fact that the plaintiff often worked overtime, particularly where there is no evidence that the plaintiff ever objected to the overtime work or raised concern about the physical effects of working extended hours.

### iii.    Failure to Develop and Implement Adequate Safety Measures

The third and final theory of negligence that Lewis pursued in his response to CSX's motion for summary judgment is that CSX failed to provide him with a timely and adequate comprehensive safety program to prevent or reduce the risk of carpal tunnel syndrome.  Of all three theories, Lewis arguably comes closest to surviving summary judgment on this theory. However, he is unable to point to more than a scintilla of evidence demonstrating that his injury was foreseeable or that there actually were any additional safety measures, such as a comprehensive training program, that could have reduced his risk of developing carpal tunnel syndrome.

The facts that may be gleaned from Lewis's testimony on the training he received from CSX are limited and largely conclusory.  Lewis stated that in the past CSX "taught [him] the wrong way of doing things," whereas by the time of his 2006 deposition, CSX was "teaching [him] the right way . . . [a]nd it is not hard on your body."  (Lewis Dep. 61.)  According to Lewis, CSX began introducing new training programs sometime during 1999, 2000, or 2001.[26] When asked to elaborate, Lewis responded that the railroad had begun to train employees with regard to proper methods of "lifting" and "supporting," and "[h]ow to save your back, save your hands, advance in the company." (*Id*. at 61-62.)  Lewis also claimed that new employees receive better training than he received when he was hired:

> The new hires that come into the railroad are now being taught the right way to do things as far as working.  And they don't have to work as hard as I did when I started.  And your body will last longer.  And some of these now[sic] hires will never see the kind of work that I had to do when I was hired in '73.

(*Id*. at 61.)

---

[26] At his 2006 deposition, Lewis testified that the new training was gradually introduced about five to seven years prior to his deposition.  (Lewis Dep. at 62.)

Viewed in a light most favorable to Lewis, his testimony is evidence that over the almost forty-year period during which Lewis has worked for CSX, the company gradually improved the amount and quality of training provided to its employees.  Aside from that general conclusion, the Court can extrapolate little else about the training provided by CSX from Lewis's testimony. While perhaps probative of whether CSX breached a duty to provide proper training to prevent injuries such as carpal tunnel syndrome, the assumptions that need be drawn in order to characterize Lewis's testimony as sufficient to amount to "more than a scintilla of evidence" of actual negligence are too numerous.  Stated simply, the Court would have to assume that CSX in the past provided not just less training but training that actually was *inadequate* under the circumstances, that better training methods existed, that CSX knew or should have known about those methods, and that if implemented the training may have prevented or reduced injuries such as carpal tunnel syndrome.

Lewis attempts to fill some of those evidentiary holes through reference to the depositions of Dr. Cook, Snider, and Weldon.  Lewis argues that their testimony shows that CSX had knowledge of carpal tunnel syndrome and that it nonetheless failed to develop a comprehensive safety program to reduce the risk of carpal tunnel syndrome faced by its employees.  Lewis points specifically to all of the things that Snider, Weldon, and Dr. Cook did *not* do.  For example, Lewis highlights Snider's testimony that: (a) he focused more on incident-based injuries and did not regularly look into cumulative trauma disorders or other injuries that tended to develop gradually after months or years of repeated stress on the body; and (b) that employees tended to go through the claims department when dealing with the latter type of injury, and the claims department did not routinely notify Snider when such claims were filed.

32

With regard to Dr. Cook's testimony, Lewis hones in on the fact that after writing letters to employees who filed claims related to carpal tunnel syndrome, Dr. Cook did not try to call or speak directly with most of those employees to collect information about their injuries.  Lewis also points out that when asked whether he ever suggested that the medical department staff sit down with the claims and safety department staff to explore methods of reducing carpal tunnel syndrome injuries, Dr. Cook admitted that he personally did not do that.  As to the third deponent, Weldon, Lewis focuses on Weldon's testimony that: (a) Brown never shared with him which railroad crafts involved greater risk for development of carpal tunnel syndrome; (b) that he believes the question of whether railroad work causes carpal tunnel syndrome is still debatable; and (c) that the claims department has a separate database that it uses to track injury claims, and that no one from the medical or safety department has direct access to that database.

In focusing on what Snider, Weldon, and Dr. Cook did not do, Lewis ignores what they *did* do, or more specifically, Lewis ignores their testimony about the steps CSX took as a company to investigate and address cumulative trauma disorders.  Indeed, Snider, Dr. Cook, and Weldon did not focus on carpal tunnel syndrome because CSX hired Todd Brown to take on that specific responsibility.  Brown was the point-man for cumulative trauma type injuries and he worked with people from all three of the departments – medical, claims, and safety – in which Snider, Dr. Cook, and Weldon were or are assigned.  In other words, Brown was CSX's comprehensive response to cumulative trauma disorders.  Brown observed working conditions in an attempt to uncover and research potential risk factors.  Brown attended safety committee meetings and made recommendations as to changes to procedure.  In general, when asked about

all of the things that they did not do, the common response from Snider, Weldon, and Dr. Cook was that they personally were not responsible for that particular project or job task because Brown was handling the matter.

For one reason or another, Lewis chose not depose Brown or to provide a deposition of Brown taken in another case.  Had he done so, perhaps there would be more evidence of what CSX did or did not do to educate itself about the occurrence of and methods of preventing carpal tunnel syndrome.  Instead, Lewis relies solely on the depositions of Snider, Weldon, and Dr. Cook – three individuals who had limited involvement in CSX's response to the increasing number of cumulative trauma disorders.  For several reasons, their testimony, even when combined with Lewis's own testimony about the nature of the training he received, is not sufficient proof of negligence to warrant submitting Lewis's claim to a jury.

First, the mere fact that CSX knew that a portion of its employees had developed carpal tunnel syndrome does not mean CSX knew or should have known that the particular work Lewis was assigned to put him at risk for developing the disorder.  *See Williams v. Burlington N. & Santa Fe Ry. Co.*, 13 F. Supp. 2d 1125, 1129-30 (D. Kan. 1998) ("The mere allegation that defendant 'knew about the existence of occupational carpal tunnel syndrome,' even if true, provides no information with respect to the safety of plaintiff's particular workplace.").  CSX employs thousands of people in different positions, departments, and capacities.  Dr. Cook estimated that there were approximately 30,000 people employed by CSX during the early 2000s.  Roughly one to two percent of those employees filed work-related carpal tunnel syndrome claims each year.  Lewis offered no evidence to show what positions that subset of employees held or what tasks they performed.  For all this Court knows, those employees could

34

have been sitting at a desk, typing all day, or operating a jack hammer, or doing any number of tasks that bear no resemblance to the tasks Lewis performed.  Although "the law does not impose a duty on an employer to address a safety hazard or risk only in the event that a similar injury has occurred before from the same cause," there must be some evidence that the railroad could reasonably have anticipated that an injury is a likely result of certain conditions before it can be said that the railroad breached a duty to address those conditions.  *Aparicio*, 84 F.3d at 811, 814. CSX's general knowledge of a growing number claims related to carpal tunnel syndrome amongst its employees as a whole is not sufficient evidence to show that CSX could reasonably have anticipated that a person in Lewis's position was likely to develop carpal tunnel syndrome.

Second, although Lewis argues that CSX acted negligently by failing to institute a comprehensive safety program, Lewis offers no suggestion as to what such a program might look like.  Furthermore, there is no evidence that the steps CSX took to address carpal tunnel syndrome fell below the standard of care or that there were any ameliorative measures, such as specific exercise programs, that CSX could have but did not implement.  *See Borger*, 571 F.3d at 567 (affirming grant of summary judgment to the defendant where the plaintiff failed to show that the defendant's inspection practices fell below the prevalent standards).

A comparison of this case with *Aparicio* illustrates the importance of such evidence in cases involving cumulative trauma disorders.  At first blush, *Aparicio* is very similar to this case. In *Aparicio*, the plaintiff was a railroad employee like Lewis who had worked for Norfolk & Western Railway Company for approximately eighteen years before resigning in 1994.  84 F.3d at 805.  Aparicio worked on a "maintenance of way" crew responsible for making repairs to the railroad track and crossings.  *Id*.  His work involved the use of various tools, including air

35

tampers, jack hammers, impact wrenches, claw bars, anchor wrenches, grinders, and spike guns.
For a period of time between 1987 and 1990, duties shifted within Aparicio's crew and his
primary responsibility was to sit in and operate the controls of heavy machinery.  *Id*.  In 1990,
Aparicio was reassigned to his previous "hands-on" duties.  *Id*.  In 1987 and 1992 Aparicio
sought treatment for pain in his hands and wrist, and in 1992, he was referred to an orthopedic
surgeon who diagnosed carpal tunnel syndrome.  *Id*. at 806.  During the course of his
employment, Aparicio was diagnosed with both carpal tunnel syndrome and epicondylitis
("tennis elbow").  He received surgery to treat the former condition, but could not improve the
latter condition through treatment and eventually had to resign from his job.  *Id*.  Aparicio filed
suit against Norfolk & Western under FELA, making similar allegations of negligence as Lewis
made in the instant case.  *Id*.

        The case proceeded to trial, and at the close of Aparicio's case, the district court granted
Norfolk & Western's motion for judgment as a matter of law on the basis that there was no
evidence of negligence in the record.  Aparicio appealed the ruling and the Sixth Circuit
reversed, finding that Aparicio presented more than a scintilla of evidence to show that Norfolk
& Western should have known that Aparicio was at risk for developing an upper extremity
cumulative trauma injury and that a reasonably prudent employer would have taken steps to
ameliorate the risk of injury.  The evidentiary record in *Aparicio* shows that Norfolk & Western
had an "ergonomics program" through which the company took steps similar to those that CSX
appears to have taken to address cumulative trauma disorders:

> From the depositions of Norfolk & Western's medical director, Ray Prible, M.D.,
> and former medical director from 1987 to 1994, John Salb, M.D., the jury would
> learn that Norfolk & Western had an "ergonomics program" which included the
> identification of risk factors, and amelioration of the risk factors through

> engineering changes or administrative controls (job rotation and breaks).  Dr. Salb
> was aware of professional articles being published about carpal tunnel syndrome
> and repetitive or forceful activities in the workplace as early as the 1970's.  Dr.
> Prible testified that he understood that risk factors "are things that you do that
> could potentially put you in a position of having problems down the road."  Dr.
> Prible also testified that, as medical director of Norfolk & Western, if it came to
> his attention that a worker suffered from carpal tunnel syndrome because of work,
> he would either go out to the workplace himself or send Norfolk & Western's
> safety person to investigate the job.

*Id*. at 812.  However, there was additional evidence in *Aparicio* that, when viewed in a light most

favorable to Aparicio, showed that despite its "ergonomics program," Norfolk & Western did not

do enough in Aparicio's case to ameliorate risks about which they knew or should have known.

That additional evidence included the testimony of an ergonomics expert, which showed that

Aparicio's job involved "risk factors accepted in the biomechanical and ergonomics community

for upper extremity cumulative trauma disorders such as carpal tunnel syndrome and

epicondylitis," and that there were known remedial measures that Norfolk & Western could have

implemented to reduce Aparicio's risk of developing such disorders.  *Id*. at 811-12.  Aparicio

also presented evidence that although he informed Norfolk & Western in writing that he had

been diagnosed with work-related carpal tunnel syndrome, Norfolk & Western made no

modifications to his job duties.  *Id*. at 812.

Lewis's case suffers from an absence of such evidence, and while this Court does not

hold that expert testimony is required in FELA negligence cases, it does find that the evidence

Lewis presented in this case is not sufficient to save Lewis's claim.  As discussed at length

above, there is no evidence in this case, other than the fact that Lewis developed carpal tunnel

syndrome, that the tasks Lewis performed, the frequency with which he performed those tasks,

or the duration of his work, created a work environment that was not reasonably safe.  Nor is

there any evidence that Lewis's work involved risks of which CSX knew or should have known or that there were any additional steps CSX could have taken to ameliorate possible risks.  In a recent FELA case against CSX in which an employee who developed bilateral rotator cuff syndrome raised allegations of negligence similar to those raised in the instant case and presented evidence similar to the evidence discussed herein, the Southern District of Georgia found that the plaintiff failed to set forth sufficient evidence of negligence and granted summary judgment to CSX.  In doing so, the district court noted the following as to the duty of judges in cases such as this:

> Trial judges must avoid the temptation to abdicate their duty to rule faithfully on summary judgment motions. Even in cases where "reasonableness" is the standard, there must still be evidence that the defendant was unreasonable. When there is no actual evidence of foreseeability and no actual evidence of negligence, a judge must rule accordingly.  As noted above, an unexamined view of some of Plaintiff's arguments might initially give the impression of being evidence of negligence or something close to it.  In such a case, where evidence almost exists, a judge may be tempted to surrender his or her duty to a jury.  "This is exactly what should not happen.  It tempts a judge to put aside his responsibility and let the jury decide whether there is any evidence in support.  A party needs some evidence of negligence to get to the jury."

*Tootle*, No. CV 509-031, 2010 WL 4269119, at * 4 (quoting *Borum v. Grand Trunk W. R.R., Inc.*, 659 F. Supp. 2d 853, 858 (E.D. Mich. 2009)).

FELA is not a workers' compensation statute and courts should not treat it as such.  Under FELA, a plaintiff cannot recover unless there is actual evidence of employer negligence.  It is possible that Lewis developed carpal tunnel syndrome as a result of the work he did for CSX.  However, the mere fact that his work may have caused or contributed to his injuries does not demonstrate that CSX breached its duty of reasonable care.  If evidence of causation alone

38

were sufficient to prove negligence, there would be no reason to address the separate elements of duty, breach, and foreseeability.[27]

There is some degree of risk inherent in all work, and the level of risk that is acceptable for any given job depends on the specific nature of that job.  For example, "[a] yardman dealing with moving cars cannot expect the same safety as a clerical worker in a ticket office."  *Conway v. Consol. Rail Corp.*, 720 F.2d 221, 223 (1st Cir. 1983) (*quoted in Potrykus v. CSX Transp., Inc.*, No. 3:09CV744, 2010 WL 2898782, at *4 (N.D. Ohio July 21, 2010)).  An employer is only required to eliminate those dangers "that can reasonably be avoided *in light of the normal requirements of the job*."  *Stevens v. Bangor & Aroostook R.R. Co.*, 97 F.3d 594, 598 (1st Cir. 1996) (emphasis added) (*quoted in Potrykus*, No. 3:09CV744, 2010 WL 2898782, at *4).  There is no evidence in this case that CSX failed to use ordinary care under the circumstances or that CSX failed to do what a reasonably prudent employer would have done under the circumstances to improve safety in the working environment.  Accordingly, CSX is entitled to summary judgment on Lewis's FELA claim.

### b.    Causation

Having found that Lewis fails to set forth sufficient evidence of negligence to survive summary judgment as to his FELA claim, the Court need not address the issue of causation.

## IV.    CONCLUSION

---

[27] In some cases, evidence of causation may also be probative of a breach of duty. However, in this case, the evidence Lewis sets forth to prove causation – namely, the expert report of Dr. Markiewitz, has no probative value with regard to whether CSX breached a known duty of care.

For the reasons set forth above, the Court **GRANTS** Defendant's Motion for Summary Judgment, **DENIES** Defendant's Motion to Strike Depositions, and **DENIES** as **MOOT** Defendant's Motion to Strike Andrew Markiewitz, M.D.'s Causation Opinions.

IT IS SO ORDERED.

                                         ___s/Susan J. Dlott_____
                                         Chief Judge Susan J. Dlott
                                         United States District Court